**KERR & WAGSTAFFE LLP**
James M. Wagstaffe (#95535)
Daniel J. Veroff (#291492)
101 Mission Street, 18th Floor
San Francisco, CA  94105
Telephone:  (415) 371-8500
Facsimile:  (415) 371-0500
wagstaffe@kerrwagstaffe.com
veroff@kerrwagstaffe.com

*Local Counsel for Plaintiff*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs (*pro hac vice application pending*)
Michael H. Rogers (*pro hac vice application pending*)
Jeffrey A. Dubbin (#287199 – CA Only)
140 Broadway
New York, NY  10005
Telephone: (212) 907-0700
Facsimile:  (212) 818-0477

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRS, Individually  and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| VOLKSWAGEN AG, VOLKSWAGEN GROUP OF AMERICA, INC., VOLKSWAGEN GROUP OF AMERICA FINANCE, LLC., MARTIN WINTERKORN, and MICHAEL HORN, | ) ) ) ) ) |
| Defendants. | ) ) ) |

**Case No.:**

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

1.     This is a federal securities class action brought on behalf of all persons ("Bondholders") who purchased or otherwise acquired private debt exempt from registration with the U.S. Securities and Exchange Commission under Rule 144A of Volkswagen AG ("Volkswagen" or the "Company") between May 23, 2014 and September 22, 2015, inclusive

(the "Class Period").  This action seeks to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC").

2. Headquartered in Wolfsburg, Germany, Volkswagen is one of the world's leading automobile manufacturers and the largest carmaker in Europe.  In 2014, Volkswagen sold over ten million cars, representing approximately 13% of the global passenger car market. The Company comprises 12 brands: Volkswagen passenger cars, Audi, SEAT, ŠKODA, Bentley, Bugatti, Lamborghini, Porsche, Ducati, Volkswagen commercial vehicles, Scania and MAN.  Volkswagen operates 31 production plants throughout the world, including a large production plant in Chattanooga, Tennessee.  The Company's wholly owned U.S. subsidiary, Volkswagen Group of America, Inc. ("Volkswagen America"), is a corporation doing business in every U.S. state and the District of Columbia and is organized under the laws of New Jersey, with its principal place of business in Herndon, Virginia.  Volkswagen America's wholly-owned subsidiary, Volkswagen Group of America Finance, LLC ("Volkswagen America Finance"), is a corporation doing business in the United States, and is organized under the laws of Delaware, with its principal place of business in Herndon, Virginia.

3. Volkswagen America Finance has issued U.S.-dollar-denominated debt securities in the United States (the "Bonds") on three occasions in 2014 and 2015, raising over $8 billion in par value.  All of these issues have been private placements, executed pursuant to an exemption from registration with the U.S. Securities and Exchange Commission (the "SEC") under Rule 144A. See 17 C.F.R. § 230.144A.  This action is therefore brought on behalf of purchasers of Volkswagen's private placements and not any of its publicly issued securities.

4. Prior to and during the Class Period, Defendants engaged in a scheme to defraud and made numerous materially false and misleading statements and omissions to Bondholders regarding the Company's operations, its business and financial condition, and its outlook. Specifically, Defendants misled the Bondholders by failing to disclose that the Company had utilized a "defeat device" in certain of its diesel cars that allowed such cars to temporarily

reduce emissions during testing, while achieving higher performance and fuel economy, as well as discharging dramatically higher emissions, when testing was not being conducted. The use of this device allowed Volkswagen to market its diesel vehicles to environmentally conscious consumers, increasing its sale of diesel cars in the United States and abroad and, as a result, its profitability. Defendants engaged in a single fraudulent scheme and uniform course of improper conduct to mislead Bondholders by making common misrepresentations and omissions in its offering memoranda to Bondholders, which were issued on or about May 23, 2014, November 20, 2014, and May 22, 2015, respectively.

5.     As a result of Defendants' scheme and false and misleading statements and omissions, Volkswagen's private debt traded at artificially inflated prices during the Class Period. For example, one Bond reached a trading high of 102.69% of par value on January 30, 2015. All Bonds traded at highs over 100% of par value during the Class Period, and fell below 100% of par value after Defendants' scheme became public.

6.     As described more fully herein, the truth regarding Defendants' false and misleading statements and omissions and scheme to defraud was revealed to Bondholders and the markets through several shocking disclosures and news reports. On September 18, 2015, the U.S. Environmental Protection Agency ("EPA") issued a Notice of Violation ("NOV"). The NOV stated that Defendants had installed sophisticated software in Volkswagen and Audi diesel vehicles sold in the United States that could detect when the vehicle was undergoing official emissions testing and turn the full emissions controls on only during the test. During normal operation, however, the emissions controls were deactivated, meaning that pollution was released into the environment at levels exceeding those allowed by federal and state clean air regulators. This software produced and used by Volkswagen is a "defeat device" as defined by the Clean Air Act.

7.     The next day, *The New York Times* published a front-page article entitled "U.S. Orders Major VW Recall Over Emissions Test Trickery." The article reported news that that the Company had "illegally installed software in its diesel-power cars to evade standards for reducing smog" and that Volkswagen had "admitted to the use of a so-called defeat device. The

recall involves 4-cylinder Volkswagen and Audi vehicles from model years 2009-2015." The article also reported that the Department of Justice ("DOJ") had opened an investigation and that fines of as high as $18 billion could be imposed as a result of Defendants' misconduct.

8.  In the days following these disclosures, which began to reveal the relevant truth that had previously been concealed from the market, Volkswagen's share price collapsed, as did the value of Bonds Defendants issued.  Specifically, between September 17, 2015 and September 22, 2015, the price of Volkswagen's common stock and preferred stock plummeted by over 33% and 36%, respectively.  Over the same time period, the price of the Bonds similarly plummeted.  For example, one Bond fell 7.4% from a pre-fraud trading value of 100.6% of par value to 93.2% by the close of September 22, 2015.  Another fell 7.8% from a pre-fraud trading value of 100.09% of par value to 92.2%.  Other Bonds suffered similar losses.

9.  The declines in Bond value have resulted in hundreds of millions of dollars in losses to Bondholders, who relied on the accuracy of Defendants' statements and suffered damages when the truth began to be revealed.

10.  This action seeks to recover for those losses.

### JURISDICTION AND VENUE

11.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

12.  Venue is proper in this District pursuant to §27 of the Exchange Act, as the Defendants conduct business in this District.

13.  In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

14.     Plaintiff Boston Retirement System ("BRS") purchased Volkswagen Bonds at artificially inflated prices during the Class Period, as described in the attached certification, and suffered an economic loss when the relevant truth was disclosed and the Bond values declined.

15.     Defendant Volkswagen is one of the world's leading automobile manufacturers and the largest carmaker in Europe.  In 2014, Volkswagen sold over ten million cars, representing approximately 13% of the global passenger car market.  The Company comprises 12 brands: Volkswagen passenger cars, Audi, SEAT, ŠKODA, Bentley, Bugatti, Lamborghini, Porsche, Ducati, Volkswagen commercial vehicles, Scania and MAN.  Volkswagen operates 31 production plants throughout the world, including a large production plant in Chattanooga, Tennessee.

16.     Defendant Volkswagen America, Volkswagen's wholly owned U.S. subsidiary, is a corporation doing business in all 50 states and the District of Columbia and is organized under the laws of the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.

17.     Defendant Volkswagen America Finance, Volkswagen America's wholly owned subsidiary, is a corporation doing business in the United States, and is organized under the laws of the State of Delaware, with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171.

18.     Defendant Martin Winterkorn ("Winterkorn") was appointed Chief Executive Officer ("CEO") of Volkswagen AG in 2007 and served as CEO and Chairman of the Board of Management[1] of Volkswagen until his resignation on September 23, 2015.  Winterkorn also served as Chairman of the Supervisory Board of Audi AG and Chairman of the Board of Management of Porsche Automobil Holding SE.  In his capacity as a Member of Volkswagen AG's Board of Management, Winterkorn signed certifications in the 2014 and 2015 Bond

---

[1] On information and belief, Plaintiff understands that the Board of Management (or *Vorstand*) "is directly responsible for managing the Company."  In addition, "[i]n general, the Board of Management must provide the Supervisory Board (or *Aufsichtsrat*) with a long-term plan for the group on an annual basis and must report on significant deviations from the existing plan."  Offering Memoranda dated May 19, 2015 at §13.1, p. 164.

1  Offering Memoranda attesting to the truth and accuracy of the Company's financial position, the

2  development and performance of its business, and descriptions of the material opportunities and

3  risks associated with the Company's expected development.  Winterkorn signed at least three

4  such certifications:  one dated February 12, 2013, another dated February 11, 2014, and another

5  dated February 17, 2015.

6      19.     Defendant Michael Horn ("Horn") is the President and CEO of Volkswagen

7  America, as well as President for the Volkswagen of America brand.  Horn assumed this

8  position in January 2014, where he stayed until his resignation on March 9, 2016.  Horn joined

9  Volkswagen America after 23 years with Volkswagen.  Horn previously served as the Global

10  Head of After Sales at Volkswagen.

11      20.     As officers and/or directors and controlling persons of Volkswagen, Volkswagen

12  America, and/or Volkswagen America Finance, the Individual Defendants[2] each had a duty to

13  promptly disseminate accurate and truthful information regarding the Company's financial

14  condition, performance, growth, operations, financial statements, business, markets,

15  management, earnings and present and future business prospects and to correct any previously

16  issued statements that had become materially misleading or untrue so that the market price of

17  the Company's stock and bonds would be based upon truthful and accurate information.  The

18  Individual Defendants' material misrepresentations and omissions and participation in a scheme

19  to defraud during the Class Period violated these specific requirements and obligations.

20      21.     The Individual Defendants were aware of or recklessly disregarded the

21  misstatements contained therein and omissions therefrom and were aware of their materially

22  false and misleading nature.  Because of their Board membership and/or executive positions

23  with Volkswagen, Volkswagen America and/or Audi, each of the Individual Defendants had

24  access to the adverse undisclosed information about Volkswagen as particularized herein and

25  knew or recklessly disregarded that these adverse facts rendered the representations made by or

26  about Volkswagen (or adopted by the Company) materially false and misleading.

27

28

---

[2] The "Individual Defendants" are Defendants Winterkorn and Horn.

22.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Volkswagen, Volkswagen America and/or Audi, were able to and did control the content of the various offering memoranda, filings, and other statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Additionally, Volkswagen is a control person of both Volkswagen America and Volkswagen America Finance by virtue of its direct authority and management over these entities as wholly-owned subsidiaries.

23.     Accordingly, each of the Individual Defendants and Volkswagen is responsible for the accuracy of the offering memoranda and releases detailed herein, and/or participated in a scheme to defraud and is therefore primarily liable for the conduct alleged herein.

**VOLKSWAGEN'S PARTICIPATION IN DEBT SECURITIES MARKETS**

24.     Volkswagen finances its activities by, among other means, selling debt securities through the capital markets of a number of countries, including the United States.  In the United States, the Company issues debt through its wholly-owned finance subsidiary, Volkswagen America Finance, although Volkswagen itself remains the ultimate obligor of this debt.  As of June 2015, Volkswagen had approximately $78 billion in total debt outstanding, issued in a number of countries and currencies.  The largest share was issued in Germany and the Netherlands, comprising nearly $45 billion in debt.  Volkswagen also has issued debt securities in Japan, Australia, Canada, and the United States.

25.     Volkswagen America Finance has issued U.S.-dollar-denominated debt securities in the United States on three occasions in 2014 and 2015, raising an aggregate of over $8 billion in par value.  All of these issues have been private placements, executed pursuant to an exemption from registration with the U.S. Securities and Exchange Commission (the "SEC") under Rule 144A.

# BACKGROUND

26.      In 2008, Volkswagen's Chief Executive Officer Martin Winterkorn outlined an ambitious growth plan, "Strategy 2018," that aimed to turn Volkswagen into the biggest, best liked, and most profitable car maker in the world by 2018.[3]  A central part of Volkswagen's "Strategy 2018" was boosting core-brand sales in the United States.  An important part of Volkswagen's sales and marketing efforts in the United States involved the promotion of its diesel vehicles as low-emission, fuel-efficient cars that offer performance comparable to that of gasoline vehicles.  Numerous publications reported that Volkswagen had set an ambitious goal – to become the largest automaker in the world by 2018.  According to *Automotive News Europe*, "a central part of its plan to get there is the goal of boosting core-brand sales in the United States."  Volkswagen's goal involved more than doubling its sales in the United States, from 324,402 units sold in 2007 to 800,000 units by 2018.

27.      An important part of Volkswagen's sales and marketing efforts in the United States involved the promotion of its diesel vehicles as low-emission, fuel-efficient cars that achieved performance comparable with gasoline vehicles.  Volkswagen's marketing campaign was successful, and Volkswagen became the largest seller of diesel passenger vehicles in the United States.

28.      Volkswagen actively promoted its diesel vehicles as both "clean" and "green," labeling its vehicles as "Clean Diesel."  Indeed, on the "Environment" page of Volkswagen America's website, the Company states that it takes "environmental responsibility very seriously.  When it comes to making our cars as green as possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, ***building the world's cleanest diesel engines*** and developing totally new power systems, which utilize new fuel alternatives."

29.      Volkswagen prominently promoted its Clean Diesel technology on the same website, claiming that it was designed to "meet the toughest emission standards":

---

[3] William Boston, *Volkswagen Strains to Keep Foot on the Gas*, THE WALL STREET JOURNAL (Dec. 10, 2014), http://www.wsj.com/articles/volkswagen-strains-to-keep-foot-on-gas-1418259788.

At Volkswagen Group, we are providing that clean diesel technologies are a practical and economically friendly bridge to the fuel alternatives of tomorrow.

Clean Diesel TDI vehicles from Audi and Volkswagen Group are built on innovative turbo-charged direct-injection engine technologies for enhanced fuel economy. We combine that with the most advanced catalytic converter systems, ***designed to meet the toughest emission standards***. Finally, we use ultra-low-sulfur clean diesel fuel. The result is the best of both worlds for people and the planet:

- More than 30% improvements in real-world fuel economy

- 25% reduction in CO2 emissions

- 90% reduction in nitrous oxide emissions

    *       *       *

According to the US Environmental Protection Agency (EPA), converting one-third of the cars on the road today to TDI Clean Diesel would save approximately 1.4 million barrels of oil a day. That's equal to the daily shipments from Saudi Arabia to the United States.

J.D. Power and Associates projects the new vehicle diesel market will triple in the coming years, reaching 15 percent of all sales by 2020 - saving 17 billion gallons of fuel over the fleet's useful life. At Volkswagen Group of America, we're miles ahead of the curve.

30.     Defendants bolstered their environmental contentions by trumpeting the fact that the Audi A3 TDI and VW Jetta TDI were named the 2010 Green Car of the Year and the 2009 Green Car of the Year, respectively. Defendants also launched a "Think Blue" program, which they explained as part of their policy of being "more responsible on the road and more environmentally conscious - not just in our cars, but everywhere, every day."

31.     Volkswagen's marketing was successful. In 2013, the Company sold 95,823 Volkswagen diesel passenger vehicles in the United States, accounting for 23.5% of total sales and an increase of 6.1% over its 2012 total of 90,294. Audi sold 10,076 diesel passenger vehicles in the United States, an increase of 40% over the 7,195 sold in 2012. Porsche sold 5,386 diesel passenger vehicles in the United States, a huge jump of 333% over the 2012 total of 1,618.

32.     In part due to its success in marketing its diesel vehicles, Volkswagen reached its ambitious goal three years early.  According to Forbes, Volkswagen became the largest automaker in the world, with 5.04 million vehicles sold worldwide in the first half of 2015.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS
ISSUED DURING THE CLASS PERIOD**

33.     Throughout the Class Period, Defendants made numerous materially false and misleading statements and omissions to Bondholders regarding the Company's operations, its business and financial results, and its outlook.

34.     On information and belief, during the Class Period the Defendants made materially false and misleading statements in all of the offering memoranda used to market the Bonds, including but not limited to the following (all emphasis added):

(a)     "***Volkswagen's top priority for research and development in 2012, 2013 and 2014 was to develop engines and drivetrain concepts to reduce emissions***, and to develop and expand the modular longitudinal toolkit platforms and the modular transverse toolkit platforms."

(b)     "***A focal point of Volkswagen's current and future development activities is and will be innovative mobility concepts and the reduction of fuel consumption and emissions*** of the fleet.  Currently, Volkswagen offers in Europe 532 models or model variants with CO2 emissions below 130g CO2/km; 416 models emit less than 120g CO2/km and 85 models are currently already below 100g CO2/km. All of these models are sold on the European market. With a broad range of development activities in the drivetrain sector, ***Volkswagen will continue to reduce the emissions of our vehicles in the coming years***.  To this end, Volkswagen is aiming to electrify the drivetrain such as with hybrid and electric vehicles, but at the same time to optimize conventional combustion engines, which, in the Company's opinion will continue to dominate for decades, in particular in the large growth regions."

(c)     "***Volkswagen is subject to laws and regulations that require it to control automotive emissions***, including exhaust emission standards, vehicle evaporation standards and onboard diagnostic system requirements."

(d)      "*Volkswagen's vehicles must comply with increasingly stringent requirements concerning emissions*. With respect to exhaust emissions, in the case of passenger cars and light commercial vehicles, EC type approval must comply with the Euro 5 exhaust emission standards. Furthermore, in the case of passenger cars and some light commercial vehicles, EC type approval or national type approval for new types of vehicles must comply with the stricter Euro 6 standards from September 1, 2014, and new vehicles must comply with the Euro 6 standards from September 1, 2015. These requirements will be applied to all light duty vehicles one year later. Heavy passenger and commercial vehicles must currently meet the Euro VI standard. The competent government authorities in the Member States of the European Union monitor compliance with the limits and may require non-compliant manufacturers to take certain measures, including a recall of the affected vehicles. Automobile manufacturers must reduce the $CO_2$ emissions of their new passenger car fleet in the European Union according to the EU average of 130g $CO_2$/km from 2012 onward with a phase-in until 2015. The target to be achieved from 2020 onward is 95g $CO_2$/km. In 2011, Regulation 510/2011 setting performance standards to reduce $CO_2$ emissions for new light commercial vehicles has become effective supplementing the regulation on $CO_2$ emissions of passenger car classes. Under the new Regulation, manufacturers in the European Union must, for the average of their new fleet of cars, reduce the $CO_2$ emissions of light commercial vehicles in category N1 gradually to 175g $CO_2$/km from 2014 to 2017. 147g $CO_2$/km is set as the limit to be achieved by 2020 (depending on its feasibility). *A failure to meet the annual emission targets results in an excess emission premium on the automobile manufacturer based on the level by which the emission limits were exceeded.*"

(e)      "U.S. federal and state governments and agencies (i.e. the U.S. Environmental Protection Agency, or (''EPA'')) have created a suite of vehicle emission regulations aimed at improving local air quality and minimizing the potential effects of global climate change. *Automobile manufacturers must ensure that their individual vehicles, and in some cases, fleets of vehicles, must comply with various pollutant, carbon dioxide, fuel economy, and zero-emission technology requirements*. Federal and state agencies also impose

standards for onboard diagnostic systems to monitor the emission control system, including the onboard refueling vapor recovery systems that control refueling and evaporative emissions. *Volkswagen is responsible under these regulations for the performance of vehicle emission control systems, as well as the emission performance of its sold cars and light duty trucks over certain time and mileage periods.*"

(f)     "*Our future business success depends on our ability to develop new, attractive and energy-efficient products that are tailored to our customers' needs and to offer these products on competitive terms and conditions*.  In their purchasing decisions, customers are increasingly emphasizing lower fuel consumption and exhaust emissions. Alternative drive technologies (for example, electric powertrains or hybrid engines) are increasingly important to customers. A significant factor in our future success is our ability to recognize trends in customer requirements in sufficient time to react to these changes and thus strengthen our position in our existing product range and the market segments we already serve, as well as to expand into new market segments. We are under continual pressure to develop new products and improve existing products in increasingly shorter time periods."

(g)     *Volkswagen's assembly, manufacturing and other operations in the United States must meet substantial regulatory requirements under various federal and state laws.  These laws severely restrict airborne and waterborne emissions*, discharges of pollutants and the disposal of waste from Volkswagen's facilities, as well as the handling of hazardous materials. These requirements may require Volkswagen to install additional monitoring and other pollution control equipment, which would be costly."

(h)     "In order to be placed on the European Union market, vehicles must comply with EC type-approval legislation, which sets out the standardized requirements for vehicles, vehicle systems, components and separate technical units. Within the context of the Framework Directive 2007/46/EC, *Volkswagen must comply with extensive legislation regulating specific safety, emissions and technical features of vehicles and their components*. The Directive provides for an EC type-approval system. With the EC type-approval, the competent government agency of the Member State certifies that a type of motor vehicle or

system (such as braking systems), component (such as tires) or independent technical unit (such as lateral safety devices) conforms to the applicable regulations and technical requirements. A valid EC type-approval is a prerequisite to registering, selling and operating motor vehicles, systems, components or separate technical units in the Member States of the European Union."

35.     On information and belief, during the Class Period the Defendants made material omissions in all of the offering memoranda used to market the Bonds by failing to convey information regarding the Company's egregious use of a "defeat device" in its diesel-power cars to evade compliance with emissions standards.

36.     The Defendants also made additional materially false and misleading statements and omissions during the Class Period, including but not limited to the following:

(a)     On May 31, 2011, Volkswagen issued a press release entitled "US Department of Transportation Secretary Ray LaHood views Clean Diesel engines as a key component of future technology for highway transportation in the USA."  In the press release, Defendants stated:

> High-tech **Clean Diesel engines from Volkswagen are a cornerstone in the environmentally-friendly renewal of individual mobility in the United States**.  US Secretary of Transportation Ray LaHood focused on this Tuesday last week in his welcoming speech at the opening ceremony for Volkswagen's new plant in Chattanooga, Tennessee.
>
> US Secretary of Transportation Ray LaHood emphasised that the USA finds itself in an era of transition towards a new form of mobility - and thanks to the innovative technologies of Volkswagen, clean diesel engines will play an important role in implementing a new powertrain strategy for the United States.  "And that is not only because it is the right engine for environmental and climate protection in the USA.  Clean diesel engines also make sense economically, for both individuals and American companies.  The Clean Diesel technology that is found in the new US Passat, for example, makes a genuine difference."
>
> *        *        *
>
> **In April 2011, the diesel share of vehicles sold by Volkswagen of .America was 24 per cent.  This means that nearly one in every four Volkswagen brand cars delivered in the USA has a fuel-efficient and clean TDI engine**.  The Volkswagen Group is the global market leader in diesel engine technology, and back in 2008 it was the first carmaker to offer diesel vehicles on the US market that conformed to the BIN-5 standard, the most stringent emissions legislation in the world.  In America, the

1    Volkswagen brand already offers four TDI clean diesel models, and the Audi brand offers two. This year, the new Passat TDI and the Beetle TDI will be added. Audi has announced that it will bring the TDI to the luxury class in the USA and offer TDI clean diesel engines in both the Audi A6 and Audi A8 in 2013.

4    Many experts consider these diesel engines to be the most advanced combustion engines of our times. They combine minimum fuel consumption and the *lowest emissions with maximum power*. Depending on the specific model, Clean Diesel technologies may include an SCR catalytic converter - which reduces nitrogen oxide emissions (NOx) by up to 90 percent - or a NOx storage catalytic converter and oxidation catalytic converter, particulate filter, exhaust gas recirculation (EGR) and intelligent interventions by the electronic engine management system.

9    (b)    On December 20 2013, Volkswagen America issued a press release entitled "It's Official: Volkswagen Group of America Has Sold More Than 100,000 TDI® Clean Diesel Vehicles in 2013." In the press release, Defendants announced that Volkswagen "has *sold 100,000 TDI® Clean Diesel vehicles from the Volkswagen and Audi brands this year*. This is the first time it has reached this milestone in a calendar year." The press release further stated that "Audi and Volkswagen pioneered TDI® Clean Diesel engines and, as a result, the *Volkswagen Group of America is the current market leader in Clean Diesel*. Today's Clean Diesel engines deliver more torque, better highway fuel consumption and *reduced CO2 emissions* compared with equivalent gasoline engines." Volkswagen America's Chief Operating Officer Mark McNabb was quoted in the press release, stating that "'[s]elling more than 100,000 TDI Clean Diesel vehicles is a significant milestone for Volkswagen Group of America . . . . We're excited to see the increasing numbers of customers able to enjoy the reliability, durability, fuel-efficiency and power of the clean diesel engine.' Scott Keogh, President of Audi of America, was also quoted in the press release, stating that "'[t]he past year has shown that American consumers clearly recognize the benefits of clean diesel TDI vehicles . . . . They understand now more than ever that this is a technology *delivering real answers to society's concerns about fuel consumption and greenhouse gas emissions without compromises*.'"

(c)      On January 3, 2014, Volkswagen America issued a press release entitled "Volkswagen Reports December 2013 and Year End Results."  In the press release, defendants stated:

> . . . Volkswagen of America, Inc. (VWoA) today reported 407,704 units delivered in 2013.  December deliveries totaled 34,015.
>
> **Volkswagen's high-mileage, TDI® Clean Diesel models totaled 95,823 units for the year accounting for 23.5 percent of sales in 2013 and 17.8 percent in December.  Since 2000, Volkswagen of America has delivered over 500,000 TDI® Clean Diesel vehicles.**
>
> "Volkswagen is now operating at a new plateau, delivering over 400,000 units for the second consecutive year in over 40 years," said Mark McNabb, chief operating officer, Volkswagen of America, Inc.  "We look forward to 2014, with the introduction of the new Golf family, continued increased awareness and enthusiasm for the brand's core models and the strength of our TDI offerings, we are well positioned for our next phase of growth to come over the next few years."
>
> The Chattanooga-built Volkswagen Passat continues to demonstrate its strong appeal in the market with 9,254 units sold in December and 109,652 for the year.  **Clean Diesel TDI Passat sales were the best year on record with 34,963 vehicles delivered, accounting for 32 percent of sales of the year.**

(d)      On March 6, 2014, Volkswagen America issued a press release entitled "Volkswagen Group of America Releases 2013 Corporate Social Responsibility Report."  In the press release, Defendant Horn stated that "'Volkswagen Group of America is united not only by our devotion to building quality vehicles, but also by our **commitment to doing what's right for the environment**, our communities and our employees.'"  The press release also stated that "[c]utting-edge technologies have enabled Volkswagen to **progress toward carbon-neutral vehicles, including . . . TDIO clean diesel vehicles**.  In 2013, Volkswagen and Audi accounted for 75 percent of the U.S. market for clean diesel vehicle sales, enabling owners nationwide to achieve up to 30 percent improved fuel-economy compared to gasoline vehicles."

(e)      On January 5, 2015, Volkswagen America issued a press release entitled "Volkswagen Reports December 2014 Sales and 2014 Year-End Results."  In the press release, defendants stated:

. . . Volkswagen of America, Inc. (VWoA) today reported 34,058 units delivered in December, with 366,970 units delivered in 2014.

"In 2014 Volkswagen of America enhanced the lineup of German-engineered vehicles with an all-new, award-winning Golf family, a refreshed Jetta and most recently a refined Touareg," said Mark McNabb, chief operating officer, Volkswagen of America. "As we kick off 2015, we are encouraged that the vehicles have been well received by both the automotive press and our dealers."

\*        \*        \*

*Volkswagen's high-mileage, TDI® Clean Diesel models totaled 79,422 units for the year, accounting for 21.6 percent of sales in 2014. In December, 5,348 units were sold, 15.7 percent of sales.*

37.    The true facts, which were known or disregarded by Defendants but concealed from the Bondholders during the Class Period, include the following:

(a)    Volkswagen had utilized an unlawful "defeat device" in many of its diesel vehicles sold in the United States and around the globe that was designed and intended to detect when the vehicle was undergoing official emissions testing and turn the full emissions controls on only during the test.  At all other times, however, the emissions controls were deactivated, meaning that pollution was released into the environment at levels that far exceeded those allowed by federal and state clean air regulators.

(b)    Defendants' statements regarding its "top priority" and "focal point" to reduce emissions in its vehicles were materially false and misleading because Defendants actually prioritized use of an illegal defeat device rather than actual reduction in emissions.  In addition, Defendants' representation to "continue to reduce the emissions of our vehicles in the coming years" was materially false and misleading because it untruthfully implied both that its vehicle emissions were already reduced, and that such reductions would continue, when Volkswagen's diesel engines actually emitted more pollutants than Defendants had represented.

(c)    Defendants' statements regarding Volkswagen's past and future sales, future business success, income and profitability were materially false and misleading because Defendants failed to disclose that such sales, income and profitability were *only* achieved by misleading its customers, government regulators and investors regarding the operation,

1    performance and environmental impact of its diesel engines, which contributed materially to

2    such sales.

3         (d)    Defendants' statements regarding "Clean Diesel," as well as their

4    statements regarding Volkswagen's commitment to sustainability and environmental protection,

5    were materially false and misleading because Volkswagen's diesel engines emitted far more

6    pollutants than Defendants had represented, and Defendants concealed the environmental

7    impact of the Company's diesel engines by intentionally manipulating such engines to prevent

8    their misconduct from being detected.

9         (e)    Defendants' statements that it "must meet" and/or "must comply" with

10   applicable emission regulations were materially false and misleading because they untruthfully

11   implied that the Company, and the diesel engines it sold, *did* comply with the same regulations,

12   when in fact the engines it sold did *not* comply.  These statements were also materially false and

13   misleading because they untruthfully omitted the truth that Volkswagen's diesel engines emitted

14   pollutants in a way that did not meet or comply with applicable emission regulations, and

15   Defendants concealed the environmental impact of the Company's diesel engines by

16   intentionally manipulating such engines to prevent their misconduct from being detected.

17        (f)    Volkswagen was exposed to the risk of suffering billions of dollars in

18   damages from fines, penalties, judgments and reputational damage, among other things, if its

19   unlawful misconduct were discovered.  Such a risk materially impacts the creditworthiness of

20   the Company, as well as its ability to pay its debts including the Bonds, materially decreasing

21   the value of its Bonds.

22                        **THE TRUTH IS REVEALED**

23        38.    The conduct alleged herein and the materially false and misleading statements

24   and omissions made during the Class Period caused Volkswagen Bonds to trade at inflated

25   prices during the Class Period and operated as a fraud or deceit on Bondholders.  For example,

26   one Bond reached a trading high of 102.69% of par value on January 30, 2015.  All Bonds

27   traded at highs over 100% of par value during the Class Period, and all Bonds fell below 100%

28   of par value after Defendants' scheme became public.

39.     Later, when the relevant truth began to be disclosed regarding Defendants' conduct, the prices of Volkswagen's Bonds suffered significant declines as the artificial inflation began to come out of the prices.

40.     On September 18, 2015, the EPA issued an NOV.  The NOV stated that Defendants had installed sophisticated software in Volkswagen and Audi diesel vehicles sold in the United States that could detect when the vehicle was undergoing official emissions testing and turn the full emissions controls on only during the test.  At all other times, however, the emissions controls were deactivated, meaning that pollution was freely released into the environment at levels exceeding those allowed by federal and state clean air regulators.  This software produced and used by Volkswagen is a "defeat device" as defined by the Clean Air Act.

41.     That same day, *The New York Times* published an article on its website (and on its front page the next day, under the title "U.S. Orders Major VW Recall Over Emissions Test Trickery").  The article reported that the Company had "illegally installed software in its diesel-power cars to evade standards for reducing smog" and that Volkswagen had "admitted to the use a so-called defeat device.  The recall involves 4 cylinder Volkswagen and Audi vehicles from model years 2009-2015."  The article also reported that the DOJ had opened an investigation and that fines of as much as $18 billion could be imposed as a result of Defendants' misconduct.

42.     Before trading resumed, on September 20, 2015, Volkswagen's CEO, Defendant Winterkorn, issued a statement regarding the EPA's findings of "manipulations that violate American environmental standards" in Volkswagen diesel cars.  Winterkorn admitted that Volkswagen had "broken the trust of our customers and the public" and had begun an external investigation regarding the misconduct.  Volkswagen also ordered its U.S. dealerships to stop selling cars impacted by the investigation until further notice.

43.     On this news, the value of Volkswagen's Bonds declined.  For instance, three Bonds traded before these revelations at above-par prices 100.09%, 100.01%, and 100.60%, yet fell below par by the opening of the next trading day, to 98.14%, 99.11%, and 98.90% of par value, respectively.

44.     On September 22, 2015, Volkswagen issued a press release that provided further details on the breadth of the Company's misconduct.  The Company reported that "further internal investigations conducted to date have established that the relevant engine management software is also installed in other Volkswagen Group vehicles with diesel engines. . . . Discrepancies relate to vehicles with Type EA 189 engines, involving *some eleven million vehicles worldwide*."  The Company also reported that it had set aside a provision of €6.5 billion in the third quarter of 2015 related to the misconduct.  This news was quickly reported by news outlets across the world, including an article in *The New York Times* entitled "Volkswagen Says 11 Million Cars Worldwide Are Affected in Diesel Deception."

45.     On this news, the value of Volkswagen's Bonds declined further in value.  By the close of trading on September 22, 2015, the percent par value of the three Bonds described in ¶ 43 fell an additional 6.01%, 3.14%, and 5.78%, respectively.

46.     Cumulatively, the Bonds fell an average of 4.23% from before the fraud was revealed to the close of trading on September 22, 2015.  Each of the Bonds declined in value over this time period.

47.     The timing and magnitude of the declines in the prices of Volkswagen's Bonds negates any inference that the losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

48.     Like other members of the Class of Volkswagen Bondholders who purchased at artificially inflated prices during the Class Period in reliance on Defendants' material misrepresentations, Plaintiff suffered an economic loss (i.e., damages) when the prices of Volkswagen's Bonds declined, as set forth above.

49.     At all relevant times, the market for Volkswagen Bonds was efficient for the following reasons, among others:

(a)     Volkswagen communicated with eligible Bond purchasers via offering memoranda bearing the same or substantially similar information;

1    (b)    Volkswagen filed periodic public reports readily available to all actual

2  Bondholders and potential bondholders; and

3    (c)    Volkswagen regularly communicated with the public via established

4  market communication mechanisms, including through regular disseminations of press releases

5  on the major newswire services and through other wide-ranging public disclosures, such as

6  communications with the financial press, securities analysts and other similar reporting services.

7    50.    In Summary

8    (a)    Defendants made common misrepresentations or failed to disclose

9  material facts during the Class Period;

10    (b)    the omissions and misrepresentations were material;

11    (c)    the Company's Bonds traded in an efficient market;

12    (d)    the misrepresentations alleged would tend to induce a reasonable investor

13  to misjudge the value of the Company's Bonds; and

14    (e)    Plaintiff and other members of the Class purchased Volkswagen Bonds

15  between the time Defendants misrepresented or failed to disclose material facts and the time the

16  true facts were disclosed, without knowledge of the misrepresented or omitted facts.

17    **INAPPLICABILITY OF STATUTORY SAFE HARBOR**

18    51.    The statutory safe harbor provided for forward-looking statements under certain

19  circumstances does not apply to any of the false statements or omission pleaded in this

20  Complaint.  The safe-harbor has no application to the false financial statements issued.  Many of

21  the specific statements pleaded herein were not identified as "forward-looking statements" when

22  made. To the extent there were any forward-looking statements, there were no meaningful

23  cautionary statements identifying important factors that could cause actual results to differ

24  materially from those in the purportedly forward-looking statements. Alternatively, to the extent

25  that the statutory safe harbor does apply to any forward-looking statements pleaded herein,

26  Defendants are liable for those false forward-looking statements because at the time each of

27  those forward-looking statements was made, the particular speaker knew that the particular

28  forward-looking statement was false, and/or the forward-looking statement was authorized

1    and/or approved by an executive officer of Volkswagen who knew that those statements were

2    false when made.

3                          **CLASS ACTION ALLEGATIONS**

4          52.   Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of

5    the Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased

6    or otherwise acquired Volkswagen Bonds exempt from registration with the U.S. Securities and

7    Exchange Commission under Rule 144A between May 23, 2014 and September 22, 2015,

8    inclusive, and who were damaged thereby.  Excluded from the Class are Defendants and their

9    families, the officers and directors of the Company, at all relevant times, members of their

10   immediate families and their legal representatives, heirs, successors or assigns and any entity in

11   which defendants have or had a controlling interest.

12         53.   Plaintiff allege that they are members of the Class:

13         (a)   Defendants made misrepresentations or failed to disclose material facts

14   during the Class Period, including to Plaintiff;

15         (b)   the omissions and misrepresentations were material;

16         (c)   the Company's Bonds traded in an efficient market;

17         (d)   the misrepresentations alleged would tend to induce a reasonable investor

18   to misjudge the value of the Company's Bonds, as they induced Plaintiff; and

19         (e)   Plaintiff and other members of the Class purchased Volkswagen Bonds

20   between the time Defendants misrepresented or failed to disclose material facts and the time

21   true facts were disclosed, without knowledge of the misrepresented or omitted facts.

22         54.   Members of the Class are so numerous that joinder of all members is

23   impracticable.  While the exact number of Class members can only be determined by

24   appropriate discovery, Plaintiff believes that Class members number at least in the hundreds and

25   that they are geographically dispersed.

26         55.   Plaintiff's claims are typical of the claims of the members of the Class because

27   Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful

28   conduct complained of herein.

56.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities litigation. Plaintiff has no interests that are contrary to or in conflict with the members of the Class Plaintiff seeks to represent.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

58.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws as alleged herein;

(b)     whether statements during the Class Period contained in Defendants' offering memoranda omitted and/or misrepresented material facts;

(c)     whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(d)     whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(e)     whether Defendants acted willfully, with knowledge or severe recklessness in omitting and/or misrepresenting material facts;

(f)     whether the prices of Volkswagen Bonds during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of Volkswagen Bonds when the truth was revealed and the artificial inflation came out of the Bonds' prices and, if so, what is the appropriate measure of damages.

59.     Plaintiff make the allegations herein based upon information and belief, as well as the investigation of Plaintiff's counsel, which included a review of relevant offering memoranda, regulatory filings made by Volkswagen with the SEC, as well as other regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

60.     Plaintiff incorporates ¶¶1-59 by reference.

61.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

62.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Volkswagen Bonds during the Class Period.

63.   Plaintiff and the Class have suffered damages in that they paid artificially inflated prices for Volkswagen Bonds.

64.   Plaintiff and the Class would not have purchased Volkswagen Bonds at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and scheme to defraud.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

65.   Plaintiff incorporates ¶¶1-64 by reference.

66.   The Individual Defendants acted as controlling persons of Volkswagen, Volkswagen America, Volkswagen America Finance, and Audi within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company and their ownership of Volkswagen securities, the Individual Defendants had the power and authority to cause Volkswagen, Volkswagen America and Audi to engage in the wrongful conduct complained of herein.

67.   Volkswagen, Volkswagen America, and Volkswagen America Finance controlled the Individual Defendants and all of their employees.  In addition, Volkswagen is a control person of both Volkswagen America and Volkswagen America Finance by virtue of its direct authority and management over these entities as wholly-owned subsidiaries. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.   Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel.

B.   Awarding Plaintiff and the members of the Class damages, including interest;

C.   Awarding Plaintiff's reasonable costs and attorneys' fees; and

1        D.        Awarding such equitable/injunctive or other relief as the Court may deem just

2   and proper.

3                              **JURY DEMAND**

4        Plaintiff demands a trial by jury.

5   Dated: June 20, 2016                    **KERR & WAGSTAFFE LLP**

6                                           By:  /s/ Daniel J. Veroff

7                                           James M. Wagstaffe (#95535)
8                                           Daniel J. Veroff (#291492)
                                            101 Mission Street, 18th Floor
9                                           San Francisco, CA  94105
                                            Telephone:  (415) 371-8500
10                                          Facsimile:  (415) 371-0500
                                            *wagstaffe@kerrwagstaffe.com*
11                                          *veroff@kerrwagstaffe.com*

12                                          *Local Counsel for Plaintiff*

13
                                            — and —
14
15                                          **LABATON SUCHAROW LLP**

16                                          Thomas A. Dubbs (*pro hac vice application
                                            pending*)
17                                          Michael H. Rogers (*pro hac vice application
                                            pending*)
18                                          Jeffrey A. Dubbin (#287199 – CA Only)
                                            140 Broadway
19                                          New York, NY  10005
                                            Telephone: (212) 907-0700
20                                          Facsimile:  (212) 818-0477

21                                          *Attorneys for Plaintiff*

22

23

24

25

26

27

28